## Ash v. Cummings & a.

### CONSTRUCTION OF THE FLOWAGE ACT.

To authorize the taking of land or other property for public uses, the law which provides for the taking of the property must also make provision for compensation to the owner, and that provision should be such as not only to secure to the land-owner a seasonable assessment of his damages, but should secure also their prompt payment.

This right to take property for public uses may be exercised directly by the State, or it may be conferred upon a public corporation, a private company; or upon an individual.

In cases where the State, or a county or town, is responsible for damages to the individual whose land is taken for public purposes, it may be presumed that these corporate bodies will be responsible for those damages: but with an individual or a corporation the case is different; and in such case, if the damages are not paid in advance, before the land is taken, the law should in some way provide not only for an assessment and collection of such damages, but should secure the appropriation of some definite and certain fund out of which such damages shall be paid.

The act of 1868, entitled "An act for the encouragement of manufactures," and sometimes known as the *mill act* or the *flowage act*, although it provides for an assessment of the land-owner's damages, does not take away his right to maintain an action of tort at common law to recover damages for such flowage, until there has been an assessment of damages under the act and a judgment rendered for the damages so assessed, and the amount of such judgment has been paid or tendered to the person aggrieved or damaged by the flowing of his land.

The court will so far modify its practice of granting injunctions as to conform to the spirit of this new enactment of 1868, and at the same time prevent injustice and oppression by requiring the mill-owner to give sufficient indemnity to the owner of the land to be flowed, for the damage that may result from the experiment of flowage, before the land is flowed.

Opinion in *Lebanon* v. *Olcott*, 1 N. H. 345, 346, criticised and questioned.

CASE, by David Ash against William H. Cummings and others, for flowing plaintiff's land.

The parties agree that the defendants are seized and possessed of a saw-mill, a grist-mill, two starch-mills, a bobbin and a peg manufactory, and two gold crushing mills, situated on the banks of the Ammo-

---

* Decided at Manchester (adjourned term) August 15, 1872, and inserted in advance of its place for obvious reasons.			REPORTER.

noosuc river, which is not navigable at Lisbon, in said county, and propelled by the waters of said river; that defendants, on the first day of July, 1868, and long prior thereto, had kept and maintained a dam across said river, upon their own land, at a certain height: and the plaintiff admits that defendants now have a legal right to maintain said dam at the same height.   In said month of July, 1868, and shortly after the passage of the act entitled "An act for the encouragement of manufactures," approved July 3, 1868, the defendants, under and by virtue of the provisions of said act, and without any right or authority except in so far as they may be thereby conferred, raised their said dam some eight to twelve inches, whereby the plaintiff's lands are overflowed and damaged.   The principal questions for the consideration of the court are supposed to be :   I.  Whether said act is constitutional; and if so, II.  Whether upon the foregoing facts this action can be maintained ; and if so, III.  Whether the plaintiff can recover in this action the damages in said act provided for.   In case the action is held maintainable, the question of damages is to be submitted to an auditor to be appointed by the court, in case the parties do not agree.   Notice of said damage was given to the defendants by the plaintiff in 1868, but no further action under said act has been taken by either party.

Questions of law reserved.

*Carpenter*, for the plaintiff.

The principal question in this case is, whether the act of the legislature, approved July 3, 1868, entitled "An act for the encouragement of manufactures," is constitutional.   The·plaintiff contends that the act in question is unconstitutional and void.

I.  The legislature has no power under the constitution to take private property for the purposes specified in the act.   While the authority of the legislature to take private property for "public uses," making compensation therefor, is clear, it is equally clear that it cannot appropriate such property for private uses, either with or without making compensation.

*Concord Railroad* v. *Greely*, 17 N. H. 47.   The question turns upon the proper construction to be given to the term ·"public uses," as employed in the constitution—Bills of Rights, Art.  12.   The expression has been construed as equivalent to " public benefit"—or "advantage" in the broadest sense.   It has been held that the legislature may authorize the taking of private property for any purpose calculated to promote the general welfare.   " In a broad and comprehensive view, such as has been heretofore taken of the construction of this clause of the declaration of rights, everything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the State, or which leads to the growth of towns and the creation of new sources for the employment of private capital and labor, indirectly contributes to the general welfare and to the prosperity of the whole community.   It is on this principle that many of the statutes of this

commonwealth, by which private property has been heretofore taken and appropriated to a supposed public use, are founded." "We are to look into the probable operation and effect of the statute in question, in order to ascertain whether some public interest or benefit may not be likely to accrue from the execution of the power conferred by it. If any such can be found, then we are bound to suppose that the act was passed in order to effect it." BIGELOW, C. J., in *Talbot* v. *Hudson*, 24 Law Rep. 228 (16 Gray 417). The general position thus stated is supported by many authorities in Massachusetts — *Mill Dam* v. *Newman*, 12 Pick. 467; *Hazen* v. *Essex Company*, 12 Cush. 477–8; *Commonwealth* v. *Essex*, 31 Gray 249—and was adopted by this court in *Great Falls Manuf. Co.* v. *Fernald*, 47 N. H. 444.

We respectfully ask the court to reconsider the question, and submit that this doctrine is opposed to the weight of authority, unwarranted by the language of our constitution, contrary to the spirit of the whole instrument, and that it is dangerous and pernicious in its consequences. (1.) A power derogatory to private property must be construed strictly, and not enlarged by intendment. Dwarris on Statutes 648. *Rex* v. *Croke*, 1 Cowp. 29 (Lord MANSFIELD); *Scales* v. *Pickering*, 4 Bing. 448; *Stourbridge* v. *Wheeley*, 2 B. & Ad. 792; *Lance's Appeal*, 55 Pa. 26. (2.) The plain purpose of the bill of rights is to limit and restrict the powers conferred in the body of the constitution. *Concord Railroad* v. *Greely*, 17 N. H. 54, 55; 3 Story on Constitution, p. 718, § 1858; 2 Kent 8–12. Hence, if the language be capable of two constructions, one of which will give it that effect and the other a different effect or none at all, the former must be preferred. *Church Wardens' Case*, 10 Co. 67–*b*; *Barker* v. *Warren*, 46 N. H. 124. It is also a familiar rule of interpretation of all written instruments, and of universal application, that effect and meaning are to be given to every part and word, if it be possible. Opinion of Justices, 4 N. H. 567; Dwarris on Statutes 594. But upon this construction, holding the expression "public uses" to be synonymous with public benefit or advantage, it is plain that the third clause of art. 12 in the bill of rights in no wise limits or restricts the powers conferred upon the legislature by art. 5 of the constitution,—that it in fact has no force or significance whatever. Whatever is "for the benefit and welfare of the State" is for the "public benefit," and *vice versa*. The two expressions are identical.

In regard to the suggestion of PERLEY, C. J., that the clause in question "may have been introduced to guard against the usurpation of that power by the executive department, in imitation of the royal governors who had assumed the right to dispose of the public lands by executive grant" *(Co.* v. *Fernald*, 47 N. H. 458), it is sufficient to say, first, That the royal governors never undertook to dispose of "private property" in that way: there was no evil of that kind to guard against. Secondly, The taking by the executive of private property for public uses, or indeed for any purpose without warrant of law, is prohibited expressly by art. 15 of the bill of rights. (3.) The difference in the language used in the two articles affords a very strong presumption

that a different meaning was intended; that the framers of the constitution attributed a different sense to the expressions "public uses" and "benefit and welfare of the State." It will be presumed that different words were intended to express different ideas. Dwarris on Statutes 578. (4.) Words are to be taken in their ordinary and familiar signification and import. Dwarris on Statutes 573. The word "use" is very rarely, if ever, properly employed in the sense of *mere* benefit or advantage. It includes the idea of benefit, and something more: there is implied in it, in *all* its various applications, the idea of *using*. It signifies "the quality of being able to be used": "use is applied mostly for that which is actually used": "use comprehends in it whatever is derived from the use of a thing." Crabbe's Synonymes.

The secondary meaning of benefit, &c., is derived from the fact that from the use of a thing benefit is ordinarily obtained; and it is that benefit or advantage, and no other, that the word properly signifies. (5.) By art. 5 of the constitution, "full power and authority are given to the said general court, from time to time, to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions, and instructions, either with penalties or without, o as the same be not repugnant or contrary to this constitution, as THEY MAY JUDGE *for the benefit and welfare of this State.*" Thus, by the plainest and most explicit language, the power of determining what is for the benefit and welfare of the State, that is, for the public benefit, is confided exclusively to the legislature. That is a question for their discretion, and theirs alone, and their decision cannot be reversed in a judicial tribunal. No law can be declared unconstitutional upon the ground that it is not for the public benefit and welfare, it being not otherwise "repugnant or contrary" to the constitution. *Bridge* v. *Bridge*, 7 N. H. 66; *Washington Road Co.*, 35 N. H. 140, 141; *Dartmouth College* v. *Woodward*, 1 N. H. 121; *Railroad* v. *Greely*, 17 N. H. 47, 52; *vide* STORY, J., in *Bridge* v. *Bridge*, 11 Peters 605. It is held, in very many cases, that it is for the court to adjudge what are public uses, while it is the exclusive province of the legislature to determine whether the exigency is such as to warrant this taking of private property therefor—whether this use will be for the public benefit, and so greatly for the public benefit as to warrant the taking. *Talbot* v. *Hudson*, and cases last above cited, among many others. If, then, private property may be taken at all for the public benefit merely, *merely* to promote the benefit and welfare of the State, it follows that the power to take it for any purpose is restricted only by the good sense and wisdom of the legislature. The Massachusetts courts have, it is true, assumed jurisdiction to revise the judgment of the legislature as to what is or is not for the public benefit—a clear usurpation of authority, but not very dangerous, it would seem, since they hold, in substance, that it extends only to the inquiry whether any benefit can *possibly* result from the use in question. *Vide Talbot* v. *Hudson*; *Hazen* v. *Essex Company*, 12 Cush. 477. (6.) If private property may be taken for the public benefit merely, the question of exercising the right of eminent domain becomes, in all cases, a mere question of policy or

expediency, and not of power or right under the constitution. Whether the court have authority to revise the judgment of the legislature or not, is of little importance: in either case, it is plain that every individual holds his property by the most frail and uncertain tenure; he is in fact a mere tenant at will, in the one case, of the legislature, and in the other, of the court. What is or is not for the public benefit is not a question of law, nor, except in a very modified sense, of fact. It is a mere matter of opinion, necessarily and unavoidably fluctuating, uncertain, and incapable of being subjected to rules or governed by precedent. What one legislature or court thinks for the public benefit, another thinks is not. Men's opinions change: those of our legislators, some of them, change sometime, sit is said, very suddenly and unaccountably. To-day it is determined, in the interest of manufactures, that it will be for the public benefit that dams be erected and meadows thereby flowed; to-morrow, in the interest of agriculture, that the dams be demolished in order that the meadows may be cultivated. *Meadows* v. *Canal*, 23 Pick. 45; *Talbot* v. *Hudson*, above cited.

It is no answer to say that the power is not likely to be exercised unwisely or injuriously. The sole enquiry here is, whether the security of the citizen rests in the discretion of the legislature or in the guaranty of the constitution. We cannot be sure that our legislative seats will always be filled by such wise and pure men as now occupy them. The constitution contemplates the possibility of an unwise, ignorant, and even corrupt legislature, and the principal object of its restraints is to protect individual rights against encroachment in such a contingency. (7.) How any inference can be drawn in favor of this construction from the practice of the provincial legislature, with its powers unrestricted by constitutional provisions, it is not easy to see; while, on the other hand, the fact that the only provincial law of the character in question ever enacted (the Mill Act of 1718) was repealed shortly after the adoption of our constitution, and that no law of the kind was ever passed after the constitution went into effect until nearly eighty years afterwards (1861), though the occasion and demand for such "encouragement" must have been quite as pressing during all that period as now, is, it is submitted, a very strong argument against it. The acts of 1810 and 1820, cited by counsel and referred to by the court in *Company* v. *Fernald*, were not of the kind in question. The grantees under those charters obtained no right to take or flow private property, whatever may be said of the possible intention of the legislature to grant it. Both the rivers,— certainly the Connecticut,— were highways, and the only effect of the charters was to protect the grantees from indictment for a nuisance. *Scott* v. *Willson*, 3 N. H. 325; *Wadsworth* v. *Smith*, 2 Fairf. 278; 3 Kent 427; *Eastman* v. *Company*, 44 N. H. 160; *Bridge* v. *Bridge*, 7 N. H. 36; *Washington Road Co.*, 35 N. H. 134; *Crittenden* v. *Wilson*, 5 Cow. 165. It is worthy of notice, that it is not suggested by the court or counsel, in *Company* v. *Fernald*, that any action was taken under those charters. (8.) In no one of the cases to be found in our reports prior to *Company* v. *Fernald*, in which this court has been called

upon to consider the subject, can there be found a single *dictum*, or even a suggestion of counsel, favoring this construction. On the contrary, there are many *dicta* against it. RICHARDSON, C. J., *Bristol* v. *New Chester*, 3 N. H. 534; PARKER, C. J., *Backus* v. *Lebanon*, 11 N. H. 23; GILCHRIST, J., in *Railroad* v. *Greely*, 17 N. H. 59, 60; PERLEY, C. J., in *Washington Road Co.*, 35 N. H. 140. The opinion of the court and bar, as thus shown, is entitled to great weight upon this question, more especially when it is considered how much patient labor and careful examination might have been avoided by the application of this doctrine—as, *e. g.*, in *Railroad* v. *Greely*. That this construction prevailed in Massachusetts could not have been overlooked by the court, with the case of *Mill Dam* v. *Newman*, decided in 1832, before their eyes. It is but little more than twenty-five years since the whole bar of the State was divided on the question whether railroad corporations could constitutionally be authorized to take private property for railroad purposes. The legislature decided that being private corporations they could not, and to obviate the difficulty made them public corporations. I have not been able to learn that anybody was found in that day so wise beyond the age (or so bold) as to advocate or propose this " latter day" constitutional doctrine. Clearly, the legislature (which must be presumed to know its own practice) did not then understand that this interpretation of the constitution " had long been recognized in the legislation and practice of the province and State." (9.) The results to which this construction clearly and inevitably leads, show that it is plainly unsound and cannot be maintained. The question cannot be made to turn on the *degree* or *extent* of the benefit to the public. We find, accordingly, that where this construction has been adopted, it is held that if any public benefit *may be likely* to accrue from the *probable* effect and operation of the powers conferred by the statute, it is sufficient. BIGELOW, C. J., in *Talbot* v. *Hudson; Hazen* v. *Essex Company*, 12 Cush. 477. It is plain, also, and so it is said in the same case, that no discrimination can be made between different branches of industry. The promotion of manufactures, the increase and improvement of agriculture, the growth of cities, the general increase of population, progress in the mechanical arts, the development of mines, the prosperity of every species of human industry, are all in their character equally for the benefit and welfare of the State, and are, by the very terms of the constitution (art. 83), equally entitled to its fostering care. The public benefit resulting from a large manufacturing establishment differs in degree only, and not in kind, from that derived from a store, bank, tannery, apothecary shop, shoemaker's, blacksmith's, or tinker's shop. The number of individuals beneficially affected depends wholly upon the magnitude of the business, and may be the same in either case, if that be important. (*Vide* BIGELOW, C. J., in *Talbot* v. *Hudson.*) The conclusion is unavoidable, that private property may, under the constitution, be taken, in the wisdom and discretion of the legislature, for the purposes of any branch of human industry or for any business. *Personal property may be taken as well as real, and the manufacturer or mill-owner may be authorized to take horses, oxen, wool, timber, grain,* &c., &c.,

in short, whatever is necessary to keep his mill running for the " public benefit."

It is idle to say that there can never be occasion for such authority, even if it be true, for the question is, whether, if there be or is supposed to be occasion, the legislature has power to grant such authority.

The general proposition, that the legislature cannot take the property of A and give it to B, is nowhere disputed. Yet that is exactly what the statute here in question undertakes to do. It gives to B the property of A, not upon the ground that B will improve and hold it for the use of the public, or that the public are to obtain any other greater or different rights in it than they had before, but gives it to him to hold to his own exclusive use and enjoyment, without incurring in respect thereto a shadow of obligation to anybody, for the sole reason that he will make a better use of it than A, a use that will require and employ more capital and more laborers, and so will tend to increase in a greater degree the wealth and population of the State. B's right to all the income and profits, to the whole beneficial use of the property, is as absolute, as exclusive, and as entirely without limitation or condition, as was that of A. The only difference in their power and dominion over it consists in this,—that while A might devote it to any purpose, B can appropriate it to one only. That property may be taken for any other purposes which have the same general effect, as well as for a mill-pond, is quite too plain for argument. It necessarily, therefore, follows, that the farm of slothful, improvident, and impecunious A., who permits it to run to waste and grow up to briers and Canada thistles, may be given to industrious, enterprising, and thrifty B, who will employ more capital and more workmen, dig up the briers and eradicate the thistles, producing corn and wheat in their place, and making the lands of great value which were before of none. That this would be greatly for the public benefit is undeniable. He is a public benefactor, it has been said, who makes two blades of grass grow where one only grew before. The public benefit is the same in kind, and it well may be in degree, depending upon the magnitude of the farm, in this case as in any other. The increased value merely of any property affects beneficially every individual in the State by reducing the rate of taxation, if in no other way. Numberless other and doubtless better illustrations of the absurd results of this doctrine might easily be put. That the legislature never *will* commit such outrages upon private right, could we be sure of it, is unimportant : if, upon this construction of the constitution, it CAN, the *reductio ad absurdum* is made out.

(10.) This construction is supported, so far as I can discover, by no *authority* outside of Massachusetts except *Company* v. *Fernald.* That there is great looseness of language in the statement by the court of the grounds of the decision in very many cases upon this subject is undeniable, but, in accordance with a familiar rule, the language of the court must be construed with reference to the point before them ; and the expression " benefit of the public," and others of a kindred general character, must be understood to refer to the benefit resulting from the particular use in question, which will invariably be found to

be " a public use," within the definition hereinafter given. (11.) In Massachusetts, says BIGELOW, C. J., in *Talbot* v. *Hudson,* " such legislation [*i. e.,* legislation under this construction] has the sanction of precedents coëval with the origin and adoption of our constitution, and the principle has been so often recognized and approved as legitimate and constitutional, that it has become incorporated in our jurisprudence." Statutes of the character in question had there, from the origin of the State, *been acted upon and acquiesced in, and valuable vested rights had accrued under them,* and upon this ground their decisions may perhaps be sustained—*communis error facit jus ;* but they cannot be deemed authority in this State, or elsewhere, where no such state of facts exists. (12.) What, then, is the true construction to be given to the expression " public uses ? " The following is submitted as the clear result of the authorities : The expression " public uses " is exactly equivalent to " use of the public," and the word use is employed in its strict legal sense. " Words of known legal import are to be construed in their technical sense or according to their strict acceptation, unless there appear a manifest intention of using them in their popular sense." Dwarris on Statutes 578 ; *Poole* v. *Poole,* 3 B. & P. 620. But whether the word be given its strict legal sense, or its popular and ordinary sense, as hereinbefore explained, *quacunque via,* private property can, under the constitution, be taken only, first, to be held and occupied directly by the State, in which case it is plain that the State is a mere trustee, and that the people enjoy in one form or another the whole beneficial interest ; or, second, to be held by such party as the legislature may see fit to invest with the legal title in trust for the use of the public,—so that every individual has the same legal right to the direct enjoyment of the benefits and advantages of the use to which the property is appropriated as a *cestui que trust* has to those of the property in the hands of his trustee. As may be the case with ordinary trusts, so in this,—the right of the public may be subject to reasonable rules, regulations, and conditions, but every inhabitant of the State, upon complying therewith, has a legal right, of which he cannot be deprived, to enjoy the full benefit of its use, and in the same manner and upon the same terms. The property may well be a source of profit or emolument to him who holds the legal title : that is merely the mode of compensating the trustee for the care of the property, and it may be for his investment of capital therein. So, too, the use may in its nature be confined to a particular town, city, or section of the State ; in which case a residence therein becomes one of the conditions of the right to enjoy it. As in the case of ordinary trusts, the trustee cannot, by any act of his own, relieve or discharge himself of his duties (*Richards* v. *Railroad,* 44 N. H. 139, and cases cited), so also in this case, a corporation or person who is once charged with this trust for the public cannot be relieved therefrom except " with the consent of all persons interested in the execution of the trust," that is, by the public through legislative action. *Pierce* v. *Emery,* 32 N. H. 484 ; *Richards* v. *Railroad,* 44 N. H. 136 ; 3 Kent's Com. 458 ; *Rex* v. *Railway,* 2 B. & Ald. 646. The true test is, whether the public—all the

citizens of this State—have a legal right, of which they cannot be deprived without their own consent, to enjoy the direct benefit of the uses to which the property is appropriated ; if they have, it is a public use within the meaning of the constitution, otherwise it is not.    This affords a plain, definite, and certain rule, simple in its terms and universal in its application.    Under it, private property may be taken for highways, turnpikes, bridges, locks, booms, canals, aqueducts, school-houses, cemeteries, and for all purposes of a like character, and cannot be taken for banks, insurance, manufacturing, mining companies, or for other purposes of that nature.

That every man has a legal right to travel and transport his property upon highways, turnpikes, and over bridges, to send his children to the public school, and to be buried in the public cemetery, nobody denies. He has an equal right to be carried himself and to have his goods conveyed upon canals, railroads, and over ferries, and to the use of water from a public aqueduct, owned by corporations, upon such reasonable terms and conditions as may be prescribed uniformly for all.    If this right is denied the corporation may be indicted, its franchises may be forfeited, or the person aggrieved may have his action for damages.    It is entirely immaterial whether there be any express provision giving the public such rights or not.    *Lumbard* v. *Stearns*, 4 Cush. 60 ; *Bridge* v. *Railroad*, 17 Conn. 65 ; *Bennett* v. *Dutton*, 10 N. H. 481 ; *Beekman* v. *Railroad*, 3 Paige 75 ; PUTNAM, J., in *Bridge* v. *Bridge*, 7 Pick. 496 ; STORY, J., THOMPSON, J., concurring in *Bridge* v. *Bridge*, 11 Peters 615, 630, 631, and 639 (12 Curtis 570, 584, 593) ; 3 Kent 458 ; *Elsee* v. *Gatward*, 5 (T. R.) 144, KENYON, C. J., and ASHURST, J. ; *Davis* v. *Black*, 1 Qu. B. 900.

On the other hand, banks are under no obligation to discount, nor insurance companies to insure, nor grist-mills to grind, for anybody upon any terms—*et sic de omnibus similibus*.    The plain distinction is between public uses and private uses—uses *publici juris* and *privati juris*.    In the one case, the primary and ultimate object is the accommodation of the public,—the emolument of the corporation to which the franchise is granted is subordinate and auxiliary only ; in the other, it is the mere profit of individuals, contemplating no other public benefit than such as always incidentally accrues from individual prosperity.    The owner of the property and franchise, in the one case, takes upon himself obligations to the public which he is obliged to perform, and from which he cannot escape—*Pierce* v. *Emery*, 32 N. H. 484 ; *Richards* v. *Railroad*, 44 N. H. 136 ; STORY, J., and THOMPSON, J., in *Bridge* v. *Bridge*, 11 Peters ; 4 Kent 458 ; *Swan* v. *Williams*, 2 Mich. 427 — and in the other, assumes no obligations whatever to the public, and may exercise the powers conferred upon him, or not, as he pleases.

Our position is, that private property can, under the constitution, be taken in no case except for uses of the character first named.    It is supported by many direct adjudications and by many more indirectly, and by numerous *dicta* of our most eminent jurists.    *Swan* v. *Williams*, 2 Mich. 427 ; *Merrill* v. *Cahill*, 8 Mich. 55 ; *Harding* v. *Goodlett*, 3 Yerg. 41 ; *Clack* v. *White*, 2 Swan (Tenn.) 540 ; *Pratt*

v. *Brown*, 3 Wis. 603 ; *Fisher* v. *Horicon Co.*, 10 Wis. 351 ; *Newell* v. *Smith*, 15 Wis. 101 ; *Curtis* v. *Whipple*, 24 Wis. 350 ; *Osborn* v. *Hart*, 24 Wis. 89 ; *Sadler* v. *Langham*, 34 Ala. 311 ; *Arnold* v. *Bridge*, 1 Duvall (Ky.) 372 ; *Dickey* v. *Tennison*, 27 Mo. 373 ;. *In re Hickman*, 4 Harring. (Del.) 580 ; *Gilbert* v. *Foote*, cited as not reported by MASON, J., in *White* v. *White*, 5 Barb. 483 ; *Vanhorne* v. *Dorrance*, 2 Dall. 307–316 ; *Gilman* v. *Lime Point*, 18 Cal. 229 ; *Beekman* v. *Railroad*, 3 Paige 75 ; *Lance's Appeal*, 55 Pa. 16 ; *Company* v. *Memphis*, 4 Cold. (Tenn.) 419 ; STORY, J., THOMPSON, J., concurring in *Bridge* v. *Bridge*, 11 Peters 639 (12 Curtis 592, 593) ; WOODBURY, J., in *Bridge* v. *Dix*, 6 How. 545–7 (16 Curtis 808–10) ; M'LEAN, J., same, 537 (same, 801) ; RICHARDSON, C. J., *Bristol* v. *New Chester*, 3 N. H. 534 ; PARKER, C. J., *Backus* v. *Lebanon*, 11 N. H. 23 ; *Railroad* v. *Greeley*, 17 N. H. 47 ; PERLEY, C. J., *Washington Road Co.*, 25 N. H. 140 ; POLAND, J., *Williams* v. *School Dist.*, 33 Vt. 278 ; LANE, J., *Cooper* v. *Williams*, 4 Ham. (Ohio) 253, and BRUSH, J., dissenting ; WILLIAMS, C. J., *Bridge* v. *Bridge*, 17 Conn. 64, 65 ; WALWORTH, Ch., *Bloodgood* v. *Railroad*, 18 Wend. 15, 16 ; Edwards, Senator, same, 22, 23 ; Maison, same, 47 ; Tracy, same, 60–65 ; HAND, J., *Hay* v. *Company*, 3 Barb. 42 ; 2 Kent 339, and notes ; 2 Am. Jurist, p. 30 ; Art. II, Story on Const'n, § 1393. It is worthy of consideration, that the power of eminent domain has been almost universally construed with great strictness in respect to all other questions arising under it.

The authorities are numerous, that only such interest in the property can be taken as is necessary for the use in question ; that it can be held only so long as it is used by the public,—can be diverted to no other purpose ; and, upon the discontinuance of the use, reverts to the original owner.    *Giesey* v. *Railway*, 4 Ohio St. 308 ; *McArthur* v. *Kelley*, 5 Ohio 84; *Cooper* v. *Williams*, 5 Ohio 244; *Buckingham* v. *Smith*, 10 Ohio 288 ; *Lance's Appeal*, 55 Pa. 16 ; *Jackson* v. *Railway*, 25 Vt. 150 ; *Brainard* v. *Clapp*, 10 Cush. 6 ; *Hooker* v. *Company*, 12 Wend. 371 ; *People* v. *White*, 11 Barb. 26 ; *Hazen* v. *Railway*, 2 Gray 574 ; *United States* v. *Harris*, 1 Sumner 21 ; *Blake* v. *Rich*, 34 N. H. 282, and cases cited ; *Chapin* v. *Railroad*, 39 N. H. 570–1 ; *Quimby* v. *Railroad*, 23 Vt. 387 ; *Matter of Albany Street*, 11 Wend. 149 ; *Varick* v. *Smith*, 5 Paige 137 and 9, do. 547 ; WOODBURY, J., *Bridge* v. *Dix*, 6 How. 544, *et seq.*

It seems to follow, and such is believed to be the sounder opinion, that the fee cannot be condemned in any case,—not because the language of the constitution is not broad enough to warrant it, but because it is not necessary for the purposes of the use.   Redf. on Railways (2d ed.) 124, *et seq.* (§ 69) ; *Williams* v. *School Dist.*, 33 Vt. 282.

As to any cases in North Carolina, which may be found in conflict with the foregoing views, if such there be (*vide* Angell on Watercourses (5th ed.) 552 *et seq.*), it 'is to be observed that the constitution of that State contains no provision like the one under consideration. 2 Kent 339, note ; *State* v. *Glen*, 7 Jones (N. C.) 331.

In *Williams* v. *School Dist.*, 33 Vt. 278, decided in 1860, it is said by POLAND, J., that " Similar laws [ to the Massachusetts Mill Laws ]

exist now in several other States; but the only States where their va-
lidity has been settled, so far as I have discovered, are Wisconsin and
Tennessee "—citing 1 Wis. 71, and 3 Wis. 461, and *Harding* v. *Good-
lett*, 3 Yerg. 41.   But the doctrine of the two Wisconsin cases *(New-
comb* v. *Smith* and *Thien* v. *Voegtlander)* has since been emphatically repu-
diated in that State.   *Fisher* v. *Horicon Co.*, 10 Wis. 351 (1860); *Cur-
tis* v. *Whipple*, 24 Wis. 350.   The case of *Harding* v. *Goodlett* (as stated
by Ch. WALWORTH, 18 Wend. 15, and in 1 U. S. Dig., page 561, § 140) is
not only in strict accordance with our position, but a direct adjudication
in support of it.   It was there held that private property could be taken
for the purposes of a grist-mill, *bound by law to grind the grist of all
comers*, and could not be taken for other mills resting under no such ob-
ligation.   A much narrower construction than we contend for has been
adopted, in some cases.   It has been held that a law authorizing the
taking of private property for a private way is unconstitutional; but
such a case comes entirely within our position, inasmuch as the use of
such a way is open to all for the purposes for which it is laid.   *Taylor*
v. *Porter*, 4 Hill 140, NELSON, C. J., dissenting; *Nesbit* v. *Trumbo*, 39
Ill. 110 (3 Am. Law Rev. 121); *Osborn* v. *Hart*, 24 Wis. 89; *Dickey*
v. *Tennison*, 27 Mo. 373; *Crear* v. *Crossly*, 40 Ill. 175, *Winkler* v. *Wink-
ler*, 40 Ill. 179—3 Am. Law Rev. 473; *vide*, also, *Reynolds* v. *Reynolds*,
15 Conn. 84; *Clack* v. *White*, 2 Swan (Tenn.) 540; *Sadler* v. *Lang-
ham*, 34 Ala. 311.

It is confidently believed that in not a single instance in the history
of this State, since the adoption of the constitution and prior to 1861,
has the legislature authorized or undertaken to authorize (the acts of
1810 and 1820 are not exceptions, for reasons before stated) the tak-
ing of private property for any use not strictly within the rule here
given.   Certain it is, that the laborious and patient research of the able
counsel for the plaintiff, in *Company* v. *Fernald*, has adduced none,
which fact of itself raises a very strong presumption that none can be
found; and it is respectfully submitted that the assumption, as well in
the opinion in that case as in the argument, that the construction there
adopted is sustained by legislative sanction and practice and " contem-
poraneous understanding " is entirely without foundation in fact.   More-
over, to entitle an argument drawn from such a source to any weight
whatever, it should appear not merely that such powers were con-
ferred, but also that they were exercised and the exercise acquiesced
in, which is not here pretended.   Even then the argument, in the
absence of a judicial sanction of the acts, should be given little or no
weight upon a grave constitutional question of this character, *judican-
dum est legibus, non exemplis*.   In fact, the only legislative practice to
be found on the subject is the repeal of the act of 1718.   This repeal
seems also to be relied upon as evidence of the alleged " understand-
ing " contemporaneous with the adoption of the constitution.   " The
repeal itself," it is gravely said, " shows that it was understood to be
a matter entirely within the power of the legislature, a power which
they could exercise or forbear to exercise, at their discretion, as in
their judgment the public good might require "—that is to say, the

same opinion of the legislature in respect to their constitutional power over the subject-matter of an act is shown by its repeal. as by its enactment; and *a fortiori*, it might well be added, a horse-chestnut is a chestnut horse.

In this cause, the case finds that the mills upon the dam in question are a saw-mill, grist-mill, starch-mills, bobbin and peg manufactories, and gold crushers, the proprietors of which are under no obligation to saw the lumber, grind the grist, or crush the gold ore of any one upon any terms, unless they choose to do so, and they may lawfully abandon or destroy their mills when they see fit, or appropriate them to other uses. The only benefit or advantage which anybody except the owners derives therefrom, is the remote and consequential benefit which accrues from general business prosperity,—the same precisely in kind that would enure from the establishment of a blacksmith's or a shoemaker's shop, or the opening of a dry goods store in the neighborhood. And finally, though it should be found that a reconsideration of the doctrine of *Company* v. *Fernald* is not essential to the proper disposition of this cause, yet the gravity of the question and the importance of the interests involved alike demand that the court avail itself of the first opportunity to review and reëxamine that decision, and if it be found clearly wrong, to reverse it before large amounts of capital shall be invested upon the faith of it,—or, on the other hand, if right, to reäffirm it, in order that the question may be forever set at rest. The supreme court of Wisconsin upon a similar occasion say (speaking through SMITH, J., in *Pratt* v. *Brown*, 3 Wis. 603) : " When a question involving important public or private rights, extending through all coming time, has been passed upon on a single occasion, and which decision can in no just sense be said to have been acquiesced in, it is not only the right but the duty of the court, when properly called upon, to reëxamine the questions involved, and again subject them to judicial scrutiny. We are by no means unmindful of the salutary tendency of the rule *stare decisis*, but at the same time we cannot be unmindful of the lessons furnished by our own consciousness, as well as by judicial history, of the liability to error and of the advantages of review."

II. But assuming the expressions " public use " and " public benefit " to be synonymous, the act in question is nevertheless unconstitutional and void upon several distinct and independent grounds.

(1.) It authorizes the taking of private property *for purposes confessedly not for the public benefit*. The act in terms contemplates that in every case arising under it the final decision may be adverse to the maintenance of the dam ; yet it provides expressly that the dam may be maintained until such decision is rendered. To say that the overflowing of lands for an indefinite period—it may be for years—is not a *taking* within the meaning of the constitution, is an abuse of language and an insult to common sense. *Hooker* v. *Company*, 14 Conn. 146 ; same case, 15 Conn. 312 ; PUTNAM, J., in *Mill Dam* v. *Newman*, 12 Pick. 482 ; *March* v. *Railroad*, 19 N. H. 379, 380.

(2.) The authority to determine what is or is not for the public benefit, is, by the express language of the constitution, exclusively entrusted to the legislature. (Art. 5.) It is a discretionary power in the nature of a personal trust, and cannot be delegated. *Gillis* v. *Bailey*, 21 N. H. 149; *Stoughton* v. *Baker*, 4 Mass. 522; *Brewster* v. *Hobart*, 15 Pick. 302; *Lyon* v. *Jerome*, 26 Wend. 485; *Bank* v. *Norton*, 1 Hill 501. There are grave and obvious reasons why it should not be. The citizen has a right to the determination of the " representative body of the people " that the *purpose* for which his property is to be taken will be not only for the public benefit, but also that it will be of so great a benefit as to warrant the taking. If this law is held to be valid, the legislature may, by general law, authorize any committee or the select-men of towns to take private property for any and all purposes which are in their judgment for the public benefit. The distinction between the authority conferred by this act, and the power of selectmen and commissioners in laying out highways, is marked and obvious. The act in effect delegates a legislative power.

(3.) The act gives to any individual authority to seize arbitrarily his neighbor's property, and to hold, use, and enjoy it for his own profit and advantage, for an indefinite length of time. This is contrary to the first principles of reason and common justice. We submit that the legislature has no more power to confer such a right upon any man or body of men, than it has to authorize a judge to sit in the trial of his own cause. It is in direct violation of art. 15 of the bill of rights.

(4.) Compensation must be made either before or simultaneously with the taking, or at least an *adequate and certain* remedy must be provided whereby payment can be compelled. 2 Kent 339, note; *Gardner* v. *Newburgh*, 2 Johns. Ch. 162; *Bloodgood* v. *Railroad*, 18 Wend. 18, 19; *Shepardson* v. *Railroad*, 6 Wis. 605; *Newell* v. *Smith*, 15 Wis. 101. But under this act a man may be deprived of his property for years before he is paid for it. Indeed, he is by no means sure of ever being paid: he gets nothing in any event but a judgment against the dam-builder, who may fail, run away, die insolvent, or whose property may, from the beginning, be encumbered for more than its full value. This is not such a provision for compensation as is requisite. *Bloodgood* v. *Railroad*, above cited.

(5.) No preliminary proceedings are required as in the case of highways, railroads, &c., and indeed in all other cases whereby a man may have notice that a taking of his property is contemplated. In fact the act, by requiring the injured party to give notice, seems to consider it probable that neither party may know or suspect the liability of lands to be flowed until they are actually under water. This is in violation as well of the first principles of common justice, as of art. 15 of the bill of rights. No man, it is submitted confidently, can for any cause be deprived of his property without first having notice and an opportunity to be heard. *Kingston* v. *Towle*, 48 N. H. 60, 61, and *Parsons* v. *Russell*, 11 Mich. 113, there cited.

(6.) No compensation whatever is provided by the act in case the petition under it is finally dismissed. Under this law a man may wake

in the morning to find his barns afloat, his cattle drowned, his kitchen under water, and his whole farm overflowed. That this is not a *probable* case may be admitted—certainly it is *possible*. What then is his remedy ? What, under the provisions of the act, can he do ? If lucky enough to escape drowning, he may notify the dam-builder of the injury, and is thereupon secured the privilege of negotiating for a " satisfactory adjustment " for the entire period of thirty days. At the end of that time, negotiation failing, he may file his petition in this court, and will be extremely fortunate if he reaches a conclusion of the proceeding in three years, during all which time the dam may be maintained and his farm kept under water. If the final decision is in his favor his petition is dismissed, and the court in its discretion may permit him to pay a bill of costs,—but the dam still stands, and his lands remain overflowed. How he can procure the removal of the former and regain possession of the latter, the statute does not inform him.

If, however, we suppose the dam to be removed at once and without further trouble, he recovers not his farm, but a quagmire, and *for the damages already done—for the taking and holding of his property for three years—for the practical and substantial destruction of it—he is left absolutely without remedy under the statute, and quite possibly without any remedy at all.* It is essential to the validity of the law that it should itself, and in terms, provide compensation. It is not sufficient that the party injured may be entitled to a remedy at common law. *Bridge* v. *Bridge,* 7 N. H. 70; *Gardner* v. *Newburgh,* 2 Johns. Ch. 162; *Railroad* v. *Salem,* 2 Gray 1; *Thatcher* v. *Bridge,* 18 Pick. 501; *Hooker* v. *Company,* 15 Conn. 323; *Shepardson* v. *Railroad,* 6 Wis. 605; *Newell* v. *Smith,* 15 Wis. 101; *Washington Road Co.,* 35 N. H. 134; *Eastman* v. *Company,* 44 N. H. 160.

(7.) The judgment of the court, dismissing the petition, establishes not only that the dam is thenceforth a nuisance, but also that it has been one from the beginning. The act plainly contemplates that such may in all cases, and will in some cases, be the result. There is no escape therefore from the conclusion that *the act authorizes the erection and maintenance of a nuisance.* Such a law is neither " wholesome" nor " reasonable," and is a clear violation of the right of every citizen to be " protected in the enjoyment of his property."

(8.) The act makes no provision for the removal of the nuisance at or after the termination of the authority for its maintenance. If " it would be a gross violation of the constitution to compel the owner of lands taken for public use to resort to a lawsuit to obtain compensation" (*Shepardson* v. *Railroad,* 6 Wis. 605, and see other cases last above cited), upon what principle is a law to be sustained, which compels a man either to submit to the continuance of a nuisance erected under its authority, or to abate it at his own expense, or to bring a suit at law to enforce its removal?

III. In a former brief the position was taken that this suit is well brought, and may be maintained even if the act be held constitutional

and valid.  Unless this position be sound, it is very clear that for all damages pending proceedings under the statute, there is, in case the petition be finally dismissed, no remedy whatever.

. The plaintiff adheres to that position now, not that he can himself see any entirely satisfactory grounds upon which it can stand, but confident that the ingenuity which can reach this question at all will find it easy to sustain the position by plenty of solid and substantial reasons, and will do so, rather than that justice should entirely fail. That an action of tort cannot be maintained for the doing of an act duly authorized by a law, is clear enough.    *Towle* v. *Railroad*, 17 N. H. 519 ; *Bridge* v. *Bridge*, 7 N. H. 70, 71 ; and very many other authorities *passim*.  The question must turn wholly upon the effect to be given to sec. 4 of the act in question.  The argument is, that the act, as modified by the provisions of sec. 4, merely authorizes the dam-builder to proceed at his own risk of obtaining " such adverse judgment," and leaves him liable to be treated as a trespasser *unless* and *until* he obtains it and pays or tenders the amount.    *Cushman* v. *Smith*, 34 Me. 247 ; *Bloodgood* v. *Railroad*, 14 Wend. 57.  It is no objection, it is conceived, to this construction, that it emasculates the whole act, but rather an argument in its favor.  Of a like trifling character will be found, without doubt, various other supposed objections which may possibly be pressed upon the court against this interpretation of the act.

*C. W. & E. D. Rand*, for the defendants.

These propositions are supported by authorities so numerous and uniform, that it would be a mere waste of time to cite them : 1. In the exercise of the power of eminent domain, private property cannot be taken for private uses with or without compensation.   2. Private property cannot be taken for public uses without just compensation.   3. With just compensation, private property may be taken for public uses.

What are public uses?  In answering this question the authorities begin to diverge.  The expression " public uses" may be strictly or literally construed.  A large number of authorities (respectable in weight of opinion) hold that the expression should receive a strict construction.   We think quite as large a number, equally respectable, support the doctrine of *Company* v. *Fernald*.   When the decision in that case was rendered, this difference of opinion among jurists was well understood by the court.  The case was very thoroughly argued, and it would seem that the court carefully considered all the authorities that were pertinent.  If we mistake not, the point as to the constitutionality of the act of 1862 was again presented to the court, on exceptions to the report of the commissioners who were appointed to assess damages.  Indeed, the more liberal construction of the expression " public uses" seems to have been deliberately adopted, upon full consideration.  It is possible that the decision in *Company* v. *Fernald* is wrong, but it is so well supported by reason and authority in other jurisdictions that it hardly needs to lean upon the doctrine of

*stare decisis*. Flowage acts, founded upon essentially the same doctrine that the New Hampshire act is founded upon, have been enacted in every New England State, and in a large number of the other States of the Union. Most of these acts have been sanctioned by judicial authority. See Maine Revised Statutes of 1857, 574; General Statutes of Connecticut, revision of 1866, 89; Massachusetts General Statutes of 1860, 754; Revised Statutes of Rhode Island 215; Statutes of Vermont for the years 1866, 1867, and 1869, under the head of "flowage;" *Olmstead* v. *Camp*, 33 Conn. 532; *Prescott* v. *Curtis*, 42 Maine 64; *Faribault* v. *Hulett*, 10 Minn. 30; *Hartwell* v. *Armstrong*, 19 Barb. 166; *Mowry* v. *Sheldon*, 2 R. I. 369; *Mairs* v. *Gallahue*, 9 Gratt. 94; *Cox* v. *Buie*, 12 Ired. 139; *Hendricks* v. *Johnson*, 6 Port. 472; *Hook* v. *Smith*, 6 Missouri 225; *Harding* v. *Goodlett*, 3 Yerg. 41; *Barclay Railroad Company* v. *Ingham*, 36 Penn. State 194; *Bloodgood* v. *M. & H. Railroad Company*, 18 Wendell 15.

The statement in the plaintiff's brief—"This construction is supported, so far as I can discover, by no *authority* outside of Massachusetts except *Company* v. *Fernald* "—seems to be somewhat in conflict with one to be found in Angell's Treatise upon Water-courses, sec. 487, quoted in *Olmstead* v. *Camp*, cited above. Speaking of the law allowing land to be flowed for mill purposes, he says: " It seems, however, to be abundantly well settled that it is sufficiently for the public good : for the statutory law of which we have given an account has been too long engrafted in the jurisprudence of the States in which it has been enacted, revised, and amended through a long course of legislation, and too steadily sustained by judicial sanction, to be declared not to be within the eminent domain of the government. More especially should this long and uninterrupted public acquiescence be deemed conclusive, when it is considered that the line of demarkation between a use that is public and one that is strictly and entirely private is a line not easy to be drawn." *Beekman* v. *Railroad Co.*, 3 Paige Ch. 73; Washburn on Easements 326; *Bradley* v. *Railroad Co.*, 21 Conn. 305; 25 Conn. 39; *Lance's Appeal*, 55 Pa. 25.

This last case was an application, by one Thomas, for a private lateral railroad, beginning at the mouth of his coal bed and running over complainant's land. The application was made by virtue of the act of May 5, 1832, which enacted " that if any owner or owners of land, *mills*, quarries, coal mines, lime kilns, or other real estate in the vicinity of any railroad," wished to make a lateral road, he might make application, &c. The complaint was sustained because the road was not made according to the petition, and was afterwards disused in part. The court say : " The right of the commonwealth to the private property * * * exists in her sovereign right of eminent domain, and can never be lawfully exercised but for a public *purpose*—supposed and intended to *benefit the public* either *mediately* or *immediately*." See, also, *Newcomb* v. *Smith*, 1 Chandler (Wis.) 71; *Thein* v. *Voegtlander*, 3 Wis. 461; *Pratt* v. *Brown*, 3 Wis. 603; *Fisher* v. *Horicon Co.*, 10 Wis. 351; *Newell* v. *Smith*, 15 Wis. 101.

The plaintiff's brief states that "the doctrine of *Newcomb* v. *Smith*

and *Thein* v. *Voegtlander*, has been emphatically repudiated " in Wisconsin. We do not understand that statement to be correct. *Fisher* v. *Horicon Co.*, and *Curtis* v. *Whipple*, 24 Wis. 350, are cited to sustain it. The mill-dam act of Wisconsin was passed in 1840, repealed in 1849, restored word for word in 1857, and is the law in that State to-day, so far as we have been able to discover. It is true that, in *Fisher* v. *Horicon Co.*, the judge who delivered the opinion of the court stated that if the question were to be considered *de nova*, a majority of the judges would not sustain the doctrine of the earlier decisions. But those decisions were sustained on the ground of authority. In *Pratt* v. *Brown* the court declined to discuss the constitutionality of the mill-dam act, because it was no longer an open question. In *Newell* v. *Smith* the complaint was sustained under the general mill-dam law, although a special act, which provided for ascertaining damages by a suit and verdict, was held unconstitutional. We are unable to see that the case *Curtis* v. *Whipple*, 24 Wis. 350, bears upon the point. That case held that an act which enabled a town to tax property for a private educational institution was invalid.

We have not been fortunate enough to find the case (*Harding* v. *Goodlett*, 3 Yerg. 41), and are apprehensive that the doctrine of the case is stated too broadly in the plaintiff's brief. From a note of the case in 1 U. S. Dig., p. 561, sec. 146, it would seem to be clear that the Tennessee statute of 1777, chap. 62, only authorized the taking of land for grist-mills made public mills by the statute. If the court undertook to decide that a law authorizing other mills to take land would be unconstitutional, it is plain that that part of the decision is *obiter dictum*. It is also unsound. The question of the constitutionality or unconstitutionality of the flowage laws cannot be made to turn upon so small a point. The plaintiff's brief seems to concede that a grist-mill, " bound by law to grind the grist of all comers," might constitutionally take land for flowage. It follows from this concession, that if the legislature of this State should pass an act obliging millers to grind all grists brought to them at the legal rates of toll, the act of July 3, 1868, if confined to grist-mills, and unexceptionable in its details, would be rendered constitutional. And yet what possible change in practice would such an act effect ? Would it render grist-mills any more useful to the public than they now are ? It is said, by PUTNAM, J., in *Mill Dam* v. *Newman*, 12 Pick. 477, that " if there be not an actual, there is a moral necessity imposed upon the owner of the mill to accommodate the public to the extent of his power. Who ever heard of a refusal ? " Such an act would be merely declaratory of the common law, or merely declaratory of unwritten and universal custom, extending back to the time when the first grist-mill was invented. What is the origin of the law which obliges inn-keepers and common carriers to accommodate the public ?

Again : a grist-mill, bound by law to grind all grists offered, cannot be distinguished from a railroad, unless the privilege of wandering about is more important to the public than the privilege of getting their grain ground. A man can oblige the owners of a railroad to carry

him, but he cannot put an engine on their track and travel about at his own pleasure. So he might oblige the miller to grind his grist, but he could not insist upon the right of going into the mill and grinding his grist himself. Now, suppose a law should be passed fixing the " table of prices for the conveyance of persons and property " on railroads, and repealing that part of the general statutes which provides that "All persons shall have reasonable and equal terms, facilities, and accommodations for the transportation of themselves, their agents and servants, and of any merchandise or other property, upon any railroad owned or operated in this State," would such a law destroy the constitutional right of railroads to take private property upon making just compensation ? It seems impossible that any court could so hold. In discussing the doctrine of eminent domain, it is easy enough to give neat definitions and profound symmetrical theories ; but the difficulty is, to make the definitions and theories square themselves with principles known to be sound, and with adjudged cases of admitted authority. The counsel for the plaintiff, in his brief, has given a definition of the words " public uses," which seems to afford him great satisfaction. But the definition ignores a mass of legislative and judicial authority here and elsewhere, and by its very terms excludes cases which the counsel admits ought to be included in it. Have all the citizens of this State a legal right, of which they cannot be deprived without their own consent, to enjoy the direct benefit of the district schools in the town of Bath ? In the plaintiff's brief is the following statement : " In no one of the cases to be found in our reports prior to *Company* v. *Fernald,* * * * * can there be found a single *dictum,* or even a suggestion of counsel, favoring this construction. On the contrary, there are many *dicta* against it : " that is, the construction that regards " public uses " as equivalent to " public benefit " or " advantage." In *Bristol* v. *New Chester,* 3 N. H. 534, the expressions used are " public purposes " and " public exigencies "—expressions which do not imply any idea of use in the restricted sense of that word. In *Backus* v. *Lebanon,* 11 N. H 23, the point as to which of the two constructions should be adopted is expressly left undecided. And we understand that the doctrine of *Company* v. *Fernald* is a logical deduction from the principles laid down in *Railroad* v. *Greely,* 17 N. H. 47. In that case the court say : " The right of eminent domain authorizes the taking of private property only when required by the PUBLIC INTEREST. * * * * The words [public uses] are very comprehensive, and may include a multitude of objects. Their construction is a matter for judicial decision. * * * * Not that we would undertake the very difficult, if indeed practicable task, of framing a definition which shall determine in every case the question of the validity of a law appropriating to such use the land of individuals. Such a definition should comprehend not only all the existing *public purposes* justifying such appropriation, *but should anticipate the future exigencies of society, demanding new laws and varied exercise of the protecting and fostering aid of the State.*" As to the *Mount Washington Road Co.* case, 35 N. H. 134, it is perfectly

plain that the court did not understand that the doctrine laid down on page 141 differed at all from the doctrine of *Boston Mill Dam* v. *Newman*, 12 Pick. 467, for they quote that case, and it is a leading case upon the question of the right to take land for flowage, and fully sustains *Company* v. *Fernald*.

The force of the plaintiff's criticisms upon the acts of 1810 and 1820 is not very apparent. Those acts were certainly very plain declarations of legislative opinion that it was not unconstitutional to flow lands for the benefit of mills. And, indeed, this opinion seems to have been uniform, and quite frequently expressed. It found expression in the provincial act of 1718 (which remained on the statute book nine years, under a provision of the constitution of 1783, precisely the same as the one in our present constitution, and which certainly was not repealed in consequence of any doubt as to its constitutionality) ; and again in 1810 ; and again, as we suppose, in 1811, in the charter incorporating Blodgett's Mills, though we have not examined that act; again, in 1820, and in 1861, and in 1862, and in 1868. And during all these years no adverse expression of judicial opinion has found its way into the reports. ' May we not say, in the language of C. J. PERLEY, in the *Mount Washington Road* case, 35 N. H. 145, " It would be justly regarded as a bold, not to say rash exercise of judicial authority, to declare all these acts of legislation to have been passed in violation of the constitution."

But the plaintiff contends that, admitting the doctrine of *Company* v. *Fernald* to be good law, the act of July 3, 1868, is nevertheless unconstitutional, because " it authorizes the taking of private property for purposes confessedly not for the public benefit." That depends altogether on what is meant by the " taking of private property." The clauses in section 3 of the act of 1868, which provide that the committee in the first instance, and the court finally, shall decide whether or not the flowage in each particular case 'is for public uses, were introduced for the better protection of private rights. We are unable to see that the act of 1868 differs, except in being more guardedly made, from the numerous flowage acts previously passed in New Hampshire, and the flowage acts of Maine, Massachusetts, Rhode Island, and Wisconsin. No part of the law relating to the power of eminent domain is better settled than this,—that " what are public uses justifying the exercise of this power is a question for the court; but the legislature is the sole judge as to the expediency of exercising the power." *Concord Railroad* v. *Greely*, 17 N. H. 47 ; *Petition of Mount Washington Road Co.*, 35 N. H. 134; *Dickey* v. *Tennison*, 27 Missouri 373.

Take, for illustration, the act of 1862, which is the basis of the decision in *Company* v. *Fernald*. The legislature judged it expedient to exercise the power of eminent domain for the benefit of the Great Falls Manufacturing Company. But the constitutionality of its exercise was a matter for the court to act upon, and the legislature could not deprive the court of its jurisdiction. If the court had decided that the act of 1862 was unconstitutional, the flowage of lands by the company would have been a tort, and damages might have been recovered

as if no act had been passed. In other words, the act, if constitutional, is a protection; if not constitutional, it is not a protection. In 1868. the legislature, agreeing doubtless with the court in the opinion in *Backus* v. *Lebanon*, 11 N. H. 26, that " if the power of eminent domain is exercised through the action of general laws and judicial tribunals, there is probably quite as little danger to be apprehended from its abuse as in any mode which can be devised," passed a general act for the encouragement of manufactures. And in that act they declare it expedient to exercise the power of eminent domain whenever any person or authorized corporation shall desire to erect a water-mill and a dam, and when in the opinion of the court the flowing of land caused by the dam may be of public use,—in other words, not prohibited by the constitution. The act also provides a very simple and efficacious method by means of which the parties with the aid of the court may reach the constitutional question as to the right of flowage, and also the question of damages. What change is there here except in the right direction? There is no change of jurisdiction. Before the act the legislature in some particular case judged it expedient to exercise the power of eminent domain, and the court took cognizance of the question of the constitutionality of its exercise. And in passing the act the legislature declare it expedient to exercise the power in a certain class of cases, leaving the court to decide upon the constitutionality of its exercise in each particular case. What harm is done the man who owns the flowed land? If he desires to take his damages, he need not raise the constitutional question. If he raises the constitutional question and fails, he still may have his damages; if he succeeds he will have his other remedies, as if no act had been passed. Under the act of 1862 he could not raise the constitutional question. He might raise it by bringing an action on the case, with the risk of being turned out of court and being obliged to resort to the act to get his damages.

But, says the plaintiff, the overflowing of land is *taking it*, within the meaning of the constitution. If so, the overflowing it, under the act of 1862, is *taking it*. In both cases the overflowing is under color of law; and if, *in the opinion of the court*, it is for public uses, the law is a protection; otherwise, it is not. The act of 1868 furnishes, as we think, a shorter and less expensive way of getting at the opinion of the court upon the point, which always has been and now is within its jurisdiction. Again: if overflowing the land is taking it, within the meaning of the constitution, what name should be given to the proceedings under section 4 of the act, by means of which alone can any title be derived to the land overflowed? Can the same land be taken twice within the meaning of the constitution? See *Cushman* v. *Smith*, 34 Me. 247.

There is another light in which this question may be viewed. By virtue of section 22 of the General Statutes, page 306, the proprietors of any railroad may " enter upon and use the land" which they may need, *before the question of damages has been finally adjusted with the land-owner*, by depositing the damages already assessed, and giving

security to respond to some judgment that may be rendered in the future. Now it is plain that the land-owner's damages may be greatly increased on a second hearing, and in the meantime the railroad may have become bankrupt and changed hands, and the sureties may have failed. The supposition is not so extravagant as the somewhat frightful picture in the plaintiff's brief. To say that the entering upon and using a man's land "for an indefinite period—it may be for years—is not a *taking* within the meaning of the constitution, is an abuse of language and an insult to common sense." See, also, section 27, page 306, of the General Statutes, and the Laws of 1850, chap. 953, sec. 13.

It is easy enough to imagine cases of individual hardship in the practical operation of all laws passed in the exercise of the power of eminent domain. But courts are not disposed, for trifling reasons, to declare such laws unconstitutional. The law of 1868 seems to be well guarded against the possibility of abuse. It has no application to navigable streams. It does not affect existing suits, nor any mill or mill privilege, nor the right of any town in any highway or bridge. And we think it does not authorize the overflowing of buildings, but simply the overflowing of "*land*." The case before the court is not a case of damage to any buildings; and, if the court should be of opinion that it would be unconstitutional to authorize the overflowing of buildings, the act will be construed as applying only to land in the strict sense of the word. See *Opinion of Justices*, 41 N. H. 555–6, and authorities there cited.

There does not seem to be much danger that, under a law so carefully limited in its operation, anybody will "wake in the morning to find his barns afloat, his cattle drowned, or his kitchen under water."

Perhaps the only formidable objection is, that the act authorizes the overflowing of land before the institution of proceedings to ascertain the damages. And this objection, if ever good for anything, comes too late. All the flowage acts in New Hampshire (and in the other New England States, except Connecticut and Vermont), and the flowage act of Wisconsin, are open to the same objection. We contend, also, that the authorities in New Hampshire establish the unsoundness of the objection. In *Company* v. *Fernald* the point did not escape the attention of the court, for they say : "The present case does not seem to be embarrassed by any objection to the manner in which the right is proposed to be taken, or to the party that is to take it." And in *Lebanon* v. *Olcott*, 1 N. H. 344, the reasoning of C. J. RICHARDSON is very forcible. He says: "It is also contended by the plaintiffs that the company had no right under the charter to construct dams until the damages which might result from them in overflowing lands and roads were first ascertained and paid. But, in our opinion, this construction is equally against the interests of the individuals and towns whose lands and roads are liable to be overflowed, and that of the company; nor is it by any means warranted by the language of the charter. The act provides that in case the company shall find it necessary to use the lands of private persons, such lands shall be set off and the damages

appraised in a particular manner; and that the company shall not take possession of the land until they have paid or tendered the damages assessed. By this provision the company were enabled to acquire a title to lands set off by metes and bounds, the real value of which could be easily ascertained : and there would be no inconvenience in withholding the title from the company until the value of the lands was paid or tendered. But as to consequential damages to be done to individuals and towns by constructing dams upon the falls, the case was very different. Until it was ascertained by experiment to what extent it would be necessary to erect dams to accomplish the object, and to what extent such dams would cause the water to overflow roads and lands, there could have been no certain data by which such damages could have been ascertained. Any opinion of the selectmen on the subject must have been at best only vague and uncertain conjecture, equally unsafe to all parties as a ground of decision." The second objection to the act of 1868 is, that the authority to determine what is or is not for the public benefit is entrusted to the legislature, and cannot be delegated. Article 5 of the constitution has not the least bearing upon this controversy, and we have already shown that the court is to determine what are public uses within the meaning of the constitution. The *fourth objection is*, that no adequate and certain remedy is provided whereby payment can be compelled. Section 4 of the act provides that no person shall derive any title, *or be discharged from any liability*, until he has paid or tendered the amount of the judgment. The remedy is, that the land cannot be *taken* without payment of the judgment. Without payment or tender, the act of flowing becomes a trespass. This is sufficient. See authorities cited in plaintiff's brief. The sixth objection is, that no compensation is provided in case the petition be dismissed. Why should any compensation be provided ? No land is taken, and the land-owner has all the remedies he would have if no act had been passed. The act merely obliges him to wait till, under its provisions, it may be ascertained whether or not the flowing is for public uses. This view of the statute is not unreasonable, and, we think, is as free from all merely technical objections as the doctrine of *trespass ab initio*. The present action cannot be sustained if the act of 1868 is held to be constitutional. *Lebanon* v. *Olcott*, 1 N. H. 339 ; *Bridge* v. *Bridge*, 7 N. H. 70 ; 1 Pick. 430. Courts will not declare a statute unconstitutional unless it appears to be so beyond a reasonable doubt. *Rich* v. *Flanders*, 39 N. H. 304 ; *Dartmouth College* v. *Woodward*, 1 N. H. 114.

Sargent, J. Article 12 of our bill of rights authorizes the taking of the property of individuals, and the property and franchises of corporations, and the appropriation of the same to public uses, provided it be not done without the consent of the owner or the consent of the representative body of the people. When the owner does not consent, then it has always been held that land might be taken by consent of the representative body of the people to wit, by an act of the legislature, by making just compensation therefor, but not otherwise. *Piscataqua*

*Bridge* v. *N. H. Bridge*, 7 N. H. 35 ; *Concord Railroad* v. *Greely*, 17 N. H. 47 ; *Petition of Mount Washington Road Co.*, 35 N. H. 134 ; *Crosby* v. *Hanover*, 36 N. H. 404 ; *Northern Railroad* v. *Concord & Claremont Railroad*, 27 N. H. 183 ; *Backus* v. *Lebanon*, 11 N. H. 19.

It has also been held in this State that to authorize the taking of land or other property for public uses, the law which provides for the taking of the property must also make the provision for compensation ; that it is not enough that the owner may obtain his compensation by an action for the wrong done. *Piscataqua Bridge* v. *N. H. Bridge*, 7 N. H., *supra ; Petition of Mount Washington Road Co.*, 35 N. H., *supra ; Bristol* v. *New Chester*, 3 N. H. 524, 535, in which RICHARDSON, C. J., says : " The power of the legislature to take the property of individuals for public purposes is indisputable. * * There is no doubt that when this power is exercised, a just compensation is to be made. The constitutions of some of the States expressly declare that such compensation shall be made, *and natural justice* speaks on this point where our constitution is silent." *Eastman* v. *Company*, 44 N. H. 160.

So far, then, is settled ;—the act that provides for taking land from an individual and appropriating it for public use must make provision for just compensation to the owner, or it will not be in accordance with that voice of natural justice,* which speaks in the place of a constitutional provision to that effect.

The right of thus taking property for public uses might be exercised directly by the State, or it might be conferred upon a public corporation, where one object was the public accommodation, convenience, or benefit, though the corporation might be at the same time seeking its own advantage and profit as well as the public good. *Concord Railroad* v. *Greely*, *supra.* It was also held that the same power might be given to a private corporation or company which was also seeking its own private advantage and profit as well as the public benefit. See numerous acts incorporating canal and turnpike companies, and acts for the improvement of our rivers. *Petition of Mount Washington Road Co.*, *supra ; Company* v. *Fernald*, 47 N. H. 444.

If it is constitutional to grant to a private company the right of thus taking property for public uses without the consent of the owner, it follows that it is none the less so to grant the same right to an individual, if it is done under similar restrictions and limitations, and subject to the same conditions. The use is just as public, and no more so, if the highway is built by a public corporation, or a private company, or a single individual, provided the same road is built in each case, and subject to the same regulations and restrictions.

It makes no difference whether the Amoskeag mills, at Manchester, are operated or owned by a corporation, or a private company, or an individual. If they are a public benefit, when operated and owned by a corporation, they would be none the less so if operated and owned by an individual, provided they were the same mills and operated in

---

* And see *East Kingston* v. *Towle*, 48 N. H. 59, 60.    .    REPORTER.

the same way. It is no objection, then, to the law we are considering, that it authorizes individuals as well as companies or corporations to take the property of other individuals, companies, or corporations for the purposes specified.

Neither is the act objectionable because it provides for a committee to settle the question whether any given dam, in its use of any particular stream or in the flowing of any particular lands, is necessary and of public utility; for where land is taken for public use, it may be done by general law, as in this case and the case of public highways, or by special acts, such as have been so often passed in relation to railroads, turnpikes, canals, and aqueducts. *Backus* v. *Lebanon,* 11 N. H. 19; *Company* v. *Fernald,* 47 N. H., *supra.*

In *Company* v. *Fernald* no question was raised concerning the method provided in the act for ascertaining and paying compensation to the owner; nor was that case embarrassed by any objection to the manner in which the right was proposed to be taken, or to the party that was to take it—p. 455.

Let us now examine the present case, and see what questions arise. This is an action upon the case at common law for flowing the plaintiff's land. Can it be maintained? It can, clearly, unless the right to maintain it has been taken away by this act of 1868, chap. 20. Let us examine this act, and see what are its general provisions.

Section 1 provides that " any person, or any corporation authorized by its charter so to do, may erect and maintain on his or its own land, or upon land of another with his consent, a water-mill, and a dam to raise the water for working it, or for creating a reservoir of water and for equalizing the flow of the same for its use and of mills below, upon and across any stream not navigable, upon the terms and conditions and subject to the regulations hereinafter expressed."

Section 2 provides that " if the land of any person shall be overflowed, drained, or otherwise injured by the use of such dam," and the damage thus caused be not adjusted by the parties within thirty days after notice, either party may apply to the supreme court in the county, &c., " to have the damage that may have been or may be done thereby, assessed;" and the court shall appoint a committee of three disinterested persons to determine in relation to the matters set forth in such petition.

Section 3 provides that said committee shall give notice, hear the parties, view the premises, " and if they shall be of opinion that the flowing or draining of said land, to the depth and extent that the same may or can be flowed by said dam, is or may be of public use or benefit to the people of this State, and that the same is necessary for the use of the mill or mills for which said dam was designed, they shall estimate the damages and make report," &c., but otherwise the petition shall be dismissed. If either party so elects, a jury may assess the damages, and judgment may be rendered upon the report of the committee or the verdict of the jury for the amount of the damages so assessed, with fifty per cent. added thereto.

Section 4. " No person or corporation shall derive any title from said

proceedings, or be discharged from any liability in relation to said premises, until he or it has paid or tendered to the person aggrieved or damaged the amount of such adverse judgment."

Section 5 contains certain exceptions and reservations not material to be here considered.

If we consider the provisions of this act, independent of the fourth section, we are led to inquire whether here would be provision for that just compensation held indispensable in such cases; and as the compensation is not to be made before the land is virtually taken and used, does the provision insure a safe method in which the compensation may be surely and seasonably recovered?—because, if it is indispensable that reasonable compensation be made, then if it is not made in advance, such provision must be made as will render its seasonable payment certain beyond a peradventure. But in this case the land is first to be taken, or flowed, which is substantially the same thing; for a piece of land is as effectually taken from me if it is flowed so that I cannot remain upon it or occupy it, as in any other way. It would be the most effectual way of taking my land from me, to drive me from it and keep me out of possession of it by covering it with water so deep as to render my remaining upon it, or my occupancy of it, impossible. The land is not only thus taken, but taken without notice, without an opportunity to be heard, and without any compensation.

But it is said that a way of compensation is provided. But what particular interest has the mill-owner to ask to have the damages assessed, when he will be obliged to pay them with fifty per cent. added, while, if he does not move at all, he has nothing to pay, and cannot be sued in any other mode? Suppose he is disposed to have the damages assessed as early as may be; or suppose the land-owner commences proceedings to have his damages assessed as soon as he may, after the thirty days have elapsed—it may be anywhere from one to six months before he can enter the same in court; and then suppose it is referred to the committee at the first term, and they hear the parties and make report at the next term; and suppose judgment should be rendered upon the report at the second term,—the case might be settled in course of a year from the time the land was flowed, though that would be unusually speedy justice when we consider all the delays to which such suits are liable in the course of adjustment.

But within and during that year a man's farm may be submerged, he and his family may be drowned out of his dwelling-house like a rat out of his hole, and his castle which the king cannot enter may be taken by storm, by a flood of water; a whole gold mine in Lisbon might be flooded and rendered useless during the whole time; churches and school-houses might be inundated and ruined irretrievably. In fact, every mischief which a flood of water can do, would or might be done before judgment, without any compensation, and before any remedy could be available. And then, suppose the committee should find that this flowage was not of public use or benefit to the people of this State, or was not necessary for the use of the mill for which the dam was built,—how would the land-owner get his damages? Or sup-

pose the finding is the other way, and the flowage is held to be of public benefit, &c., and a judgment is finally rendered for the actual damages done and fifty per cent. added,—what guaranty has the land-owner that the mill-owner will be responsible for that judgment when he obtains it? The mill-owner may be wholly irresponsible when he commences to flow the land. His mill and dam and water-power and all his premises may be mortgaged for their full value before he raises the water upon the land, and he may be utterly worthless, and yet all the hope of compensation the land-owner can have is the hope that sometime in the distant future he may be able to recover a judgment againt a worthless mill-owner; or if the proceeding is terminated the other way, he may, after his property is ruined, possibly have the privilege restored to him of bringing an action upon the case against a man without means or responsibility. In either case the land-owner is forced to the alternative, to use a homely adage, of " suing a beggar and catching a louse ;" and this is the just compensation which the land-owner is to receive, seasonably and certainly, for injuries and mischiefs which may have been inflicted upon him without the shadow of right, and from which he may never be able to recover himself.

This is the construction we are asked to give to this statute. But what would be gained by such a construction? If that was what was intended by this statute, we should be forced to hold that it would be unconstitutional and void; for surely no statute could be held constitutional, which should to such an extent disregard not only the plain precepts of our constitution, but also that voice of natural justice, which speaks so plainly where the constitution is silent.

If we were sure that this was the intent and design of the law, we should be obliged to find that the legislature had deliberately undertaken the hopeless task of overturning the constitution and nullifying all its safeguards.

But this we should never do unless it were absolutely unavoidable. If we could find any other reasonable construction that could be given to the act, we should of course resort to it rather than come to such an unwelcome result. Let us then examine sec. 4 of this act, and see if that will give us any clue to an interpretation of the other provisions we have been considering.

Sec. 4, as we have seen, provides that " no person or corporation *shall derive any title from said proceedings, or be discharged from any liability in relation to said premises,* until he or it has paid or tendered to the person aggrieved or damaged the amount of such adverse judgment."

That an action of tort cannot be maintained for the doing of an act duly authorized by law is well settled. *Bridge* v. *Bridge,* 7 N. H. 71 ; *Henniker* v. *Contoocook Valley Railroad,* 29 N. H. 146, and cases cited ; *Towle* v. *Railroad,* 17 N. H. 519 ; *Osgood* v. *Blake,* 21 N. H. 550 ; *Dean* v. *Sullivan Railroad,* 22 N. H. 321 ; *Fletcher* v. *State Capital Bank,* 37 N. H. 369 ; *State* v. *Wilson,* 43 N. H. 419 ; *Stokes* v. *Sanborn,* 45 N. H. 276. But that of course presupposes that the provisions of the law are constitutional. It is claimed that this act gives the mill-

owner the right to flow land, and provides a remedy for the land-owner to ascertain and recover his damages, and that this remedy must be followed, and that the action upon the case at common law is no longer available to the plaintiff, at least until the other remedy has been tried and failed.   And it is said that this provision is made as a safeguard to the land-owner, and that, though the mill-owner may flow the land, he cannot obtain title to the land until he pays the judgment.  But that is not the only provision of section 4.   The second provision is, that no person or corporation *shall be discharged from any liability in relation to said premises* until he or it pays, &c.

One of the liabilities in relation to the premises which would attach to the person flowing the same, would be the liability to be sued in an action of tort like the present for the damages thus caused.   Was that liability taken away, or was it expressly reserved by this section 4 ? It is not taken away, certainly, and it is reserved and preserved, if the language of this section is to be received and understood in its ordinary meaning.   Is there any reason why this language should not be allowed to have its plain and ordinary meaning in this connection ?   None that we can perceive, but certainly every reason why it should have. We should even put a forced construction upon language in order to find a way to be able to hold that the legislature intended to pass a constitutional law, and we should even try to be ingenious in inventing some way, if necessary, to give such construction to this section as would enable us to hold this law to be valid, if not in all its parts, at least as far as possible.

The case of *Bloodgood* v. *The Mohawk & Hudson Railroad Company*, 18 Wend. 9, is a case much in point.   In that case, by the act of incorporation, power was given to the company to enter upon, take possession of, and use the lands of individuals in the construction and maintenance of their road, with a proviso that the road should purchase the lands so taken of the owners, and if these parties could not agree, then that the damages should be appraised in a manner therein specified.   It was held, in view of the constitutional prohibition to taking private property without making just compensation to the owner, that the proviso above referred to must be deemed a condition precedent; and that the appraisal must be made, and the money paid or tendered, before the company could justify the taking of the land under their act; and that trespass *quare clausum* might be maintained until such damages were assessed and paid.   This case had been decided in the supreme court in favor of the defendants, 14 Wend. 51.   But in the court of errors it was held that the plea of defendants, by which they attempted to justify their entry on the ground that such entry was authorized by their act of incorporation, and therefore lawful, was not sufficient without alleging that the damages had first been assessed and paid ; not because the terms of the defendants' act were not literally broad enough to cover such entry, but because if construed in that way the act must be held to be unconstitutional in so far as it attempted to take the land of the owner without making him just compensation.

WALWORTH, Chancellor, in his opinion, says : " In the case under

VOL. L.        40

consideration, if this company were authorized to take possession of the plaintiff's property and complete the construction of their road before the plaintiff's damages were assessed and paid or offered to be paid to him, he might have been wholly without redress, as he had no power to compel the assessment of damages, and no adequate fund was provided for the payment of the damages when ascertained. The citizen whose property is thus taken from him without his consent is not bound to trust to the solvency of an individual, or even of an incorporated company, for corporations, as well as individuals, are sometimes unable to pay their just debts ;. *   *   *   and if the true construction of this charter was such as is contended for by defendants' counsel, I should hold that the provision which authorized the appropriation of the plaintiff's property to the use of the corporation, before the damages had been ascertained and paid, was unconstitutional and void."

"I cannot, however, agree   *   *   *   that such is the fair and legitimate construction and meaning of defendants' charter. It is a primary rule in the construction of statutes, in those countries where the limits·of the legislative power are restricted by the provisions of a written constitution, to endeavor if possible to interpret the language of the legislature in such a manner as to make it consistent with the constitution or fundamental law. Applying that principle to the statute under consideration, and having ascertained that it would be inconsistent with the fundamental law of the State to authorize the defendants to take possession of the lands of an individual without having made an adequate and certain provision for the recovery of the damages which he would necessarily sustain by such permanent occupation of his property for the purposes of the road, there appears to be no difficulty in giving such a construction to this statute as will be consistent·with the constitution, and also with the probable intention of the legislature. This may be done effectually by considering   *   * the proviso to the seventh section in the nature of a *condition precedent* not only to the acquisition.of the legal title to the land, but also to the right to enter and take the permanent possession of the land for the use of the corporation." Plea held insufficient, and *plaintiff's demurrer sustained.*

I have quoted at length from this, opinion, because it seemed to be so directly in point. In the case before us, we have only to give to the language of the legislature, as used in sec. 4, its full, fair, and usual meaning and significance, to accomplish all that is desired to carry out the true intent and meaning of the legislature, as we conceive, and at the same time give the act force and effect as a constitutional provision.

In sec. 1 it is provided that any person may erect and maintain a dam, &c., "upon the terms and conditions and subject to the regulations hereinafter. expressed," one of which conditions is that he ·shall acquire no right under the act, and be relieved from no liability until he·tenders the compensation required by the act.·

Sections· 2 and 3 provide a particular remedy to which *either* party *may*

resort,—and it may perhaps be worthy of consideration to inquire why the privilege is given to the mill-owner thus to institute proceedings against himself, when he is to pay all the damages with fifty per cent. added, and costs, unless it was to avoid a multiplicity of suits at common law, which the land-owner might otherwise bring against him, rather than apply in the way the statute has provided. By instituting proceedings under this act and paying the damages required, the mill-owners escape all litigation for subsequent flowage. This provision may have been inserted because the mill-owner is not to "be discharged from any liability" until the damages are paid or tendered.

Another reason : we are to presume that the legislature did not intend to violate the constitution, and that presumption can be fully sustained by giving full force and effect to this sec. 4, and, as we have seen, not otherwise. What reason then can be urged for not giving this section the plain and simple construction which its language indicates and which common sense would dictate, which relieves us from all difficulty in construing the other provisions of the law, and which is consistent with the presumption that the legislature did not intend to violate the constitution, and one which will enable us to hold that the act is valid, and can be used for some practical and beneficial purpose ? We are unable to discover any.

This construction of the mill act leaves the land-owner in possession of his constitutional rights, and gives him compensation before his property is destroyed or materially injured, as at common law before the passage of this act ; it enables the mill-owner to escape innumerable suits and endless litigation by applying to have the damages assessed against himself for all future time, and all the past that has not been adjusted, by showing that his is a case in which private property ought to be taken for public use with compensation, thus giving abundant constitutional effect to the act. In this suit, damages are to be assessed and judgment rendered as if the mill act had not been passed. If the judgment is satisfied, the defendants can never again, in any suit at common law or under the statute, be compelled to pay the damages recovered in this action, nor fifty per cent. thereof additional.

If a petition should be filed under the statute, and a judgment for damages should be rendered thereon before a judgment in this suit is rendered, perhaps the plaintiff might have his election to go on with this suit, and retain any security he may have, by attachment, to satisfy the judgment in this suit, or to become nonsuit and allow the subject-matter of it to be settled on the petition. If he should recover a judgment in this suit and also on the petition, and defendants should pay both judgments, the law would not, of course, justify an injunction founded on the judgment in this suit. If plaintiff recover a judgment in this suit, and it is not satisfied, and a petition should be brought under the statute, there might, perhaps, be no objection to including in the judgment on the petition the amount of the former judgment and fifty per cent. additional, treating the petition as a suit upon the former judgment as far as it goes, and treating the former judgment as conclusive as to the estimation of the damages included in it. There would be no difficulty

in settling every practical question that may arise,—nothing to be compared with the difficulties that have been overcome in the construction of the homestead act, and some others. If the land-owner chooses to go on with his common law action notwithstanding the pendency of a petition, the damages claimed in the former must be excluded from consideration in the latter.

The act, in terms, applies to cases in which land "shall be overflowed, drained, or otherwise injured by the use of such dam." It does not say *legally* or *rightfully* overflowed. If it were legally and rightfully done, there would be no need of the act; and sec. 4 is explicit that the mill-owner shall be discharged from no liability until the damages are paid.

But suppose that the land-owner endeavors to prevent the mill-owner from building his dam, or from flowing his land after the dam is built, by injunction, what course is to be taken, and what rule to be applied? A mill-owner, in a given case, may be wholly irresponsible, and in all cases there is a possibility that the flowage may not be deemed of a public benefit and necessary for the use of the mill, and some power must be lodged in the court to apply the general principle involved in ordinary cases of injunction to this new law. The spirit of this law might perhaps require that the forms should be changed, but effect may be given to the principle without conflicting with the spirit of this law.

A case might arise where the proof would render it so probable to the court, so morally certain that any possible use of a given stream by a proposed dam could not be of public utility, or necessary to the mill, that the court might, upon hearing, enjoin the mill-owner from flowing the land; but such a case would not often be likely to occur. In ordinary cases, upon application of the land-owner for an injunction, the court would notify the mill-owner; and, instead of giving the plaintiff his injunction, as we do in other cases, by his giving bond to respond in damages to the other party if he does not succeed, we should, to meet the spirit of this act, order that the mill-owner, in case he showed no other right to flow the land than what arises under this act of 1868, should deposit with the clerk of the court such an amount of cash as, upon the best evidence that the case admitted of, would be compensation for the damage about to be done; and unless he did this, or in some other way should give security equivalent to compensation, we should grant the injunction of course; but if he did this, the spirit of this act of 1868 would authorize the court to refuse an injunction in order that the mill-owner might, by actual flowage, bring himself within the letter of this act and proceed by petition.

We think that, by the mill-owner's giving security satisfactory to the court, this law would not authorize the court to interfere by injunction to prevent the mill-owner from building his dam, and showing by actual experiment of flowing that such flowage was a public benefit and necessary to his mill, and thus make out a case in which he might entitle himself to hold the land by paying such damages as should be appraised under the act. It would be the duty of the court to see that no

mischief was done without ample security for compensation ; but we think the spirit and general scope of the mill act must be held to so far alter the common law that the exercise of the power of injunction ought to be withheld, under due limitations and guards, in order to enable the mill-owner to bring himself within the mill act so far as an experiment of flowage would have that effect.    But unless the mill-owner in all cases should give ample indemnity for compensation, the injunction should issue.

So, also, with the land-owner's right to demolish the dam as a nuisance without process of law : that would be prohibited by injunction, where the mill-owner had given the security ordered by the court to pay all damages ; or, if he should then give it, an injunction would issue against the land-owner forbidding him to demolish the dam until an experiment of flowage had been tried, so that the mill-owner might bring himself within the provisions of this act if he could.

By keeping in view the great fundamental doctrine that no man's land is to be taken from him even for public use without compensation, and that hence no one can experiment with a man's land to see whether a public use can be made of it or not without full indemnity for all damage to be done and inconvenience to be suffered, we may, we think, so far modify the forms of proceeding as to conform to the spirit of this new law, and can mould the law into constitutional form so as to carry out the true intent and design of the legislature in this new enactment without making it an instrument of oppression or of wrong to any.

In cases where the State, or a county, or a town, is to be made liable for the damages which an individual may suffer by having his property taken for the public use, it is not so important that the compensation should be paid or secured in advance, provided the law provides a certain and expeditious way of ascertaining and recovering it, because there the presumption and the fact are, that these municipalities are always responsible.    But with an individual or a corporation the case may be very different, and hence in such cases the suggestion of Chancellor WALWORTH, before cited, becomes one of great importance, that the land-owner must be made sure not only of a remedy to ascertain the amount of his damage and to enforce its payment, but also of a definite and certain fund out of which he is to be paid.    By ordering the payment of a sufficient sum of money in advance to indemnify against all damages that would be likely to be assessed, or the securing in some other way a sum which shall be perfect indemnity, is simply making the necessary provision for some certain fund out of which the land-owner is to be paid, when from the nature of the case there is no other certain and definite fund on which he can with certainty rely.

In this case the plaintiff contends that the use to which the lands taken or flowed, under the act of 1868, are to be appropriated, is in no sense " a public use," such as the provision in the constitution contemplates.    But it becomes unnecessary to consider that question here. If the plaintiff were right in this position, it would of course follow that this action can be maintained.    And if he is wrong in this posi-

tion *( G. F. M. Co.* v. *Fernald,* before cited), still we hold that he can maintain his action by giving to the act in question the construction we have suggested, so as to leave it free from constitutional ·objection upon other grounds. And it can be held constitutional upon any grounds only by holding that it does not authorize the defendants to destroy or ·appropriate the plaintiff's property without compensation. With that construction the plaintiff can maintain his action at common law for the wrong done until the defendants obtain an appraisal of the damages, and pay or tender the same according to the provisions of the act.

The case of *Lebanon* v. *Olcott,* 1 N. H. 339, has been cited as an authority for the defendants, and it is a direct authority for their position. In that case the defendants, an incorporated company, were authorized to *take* lands, and to *flow* other lands and highways ; and the charter made the same provision for compensation in both cases. Yet RICH-ARDSON, C. J., in the opinion, concludes that though the land *taken* must be paid for before it is ·occupied, yet for lands or highways *flowed,* and thus damaged, the damages need not be assessed or paid until after the flowage ; in other words, that land or a highway might be taken for the purposes of flowage without paying or tendering the damages in advance, and for the reason that the selectmen could have " no certain data" in the absence of an actual experiment of flowage, and that their opinion concerning the damages would be " at best only vague and uncertain conjecture, equally unsafe to all parties as a ground of decision."

*First :*· we might doubt the correctness of the decision in that case upon the facts stated, and hold that, as the charter gave the same remedy and created the same liability in the one case as in the other, the same rule should have been applied in both.

*Second :* we might suggest that, however the facts may have been at that time (1818), there can·'be no good reason at the present time, with all the modern improvements in engineering and levelling, and all the experience and observation in flowing lands by dams for the last forty years and more, why the data might not now be sufficiently accurate to enable any competent board of referees ·or committee to form a substantially correct opinion as to the damage to be done by flowing land with' a dam of a given height.

*Third :* it would seem rather hard that a man should be compelled to give up his house or lands against his will, and suffer them to be flowed an indefinite time, in order to furnish " certain data" as " a ground of decision" upon which to estimate his own damage, when he wanted no damage and only desired to be let alone in the enjoyment of his own property, especially when the party or corporation that is thus to take his land without his consent, and compel him to wait until he shall thus furnish against himself the necessary evidence, the " certain data," for a correct decision, may be, at the time the land is taken, wholly irresponsible, or if not so then, that he may become so long before all the ·" certain data " are furnished upon which a correct decision could be made, and the land-owner thus be left, without available remedy, to

suffer injustice and wrong.  A man thus situated and thus suffering would be likely to form a very poor opinion either of the constitution itself, or of the manner in which it was interpreted and its principles applied.

*Fourth :* the last suggestion, which is perhaps more to the point than either of the others, is, that whatever the facts may have been in *Lebanon* v. *Olcott*, and whether the decision in that case upon those facts may have been right or wrong, the legislature, in the case before us, have left nothing uncertain and nothing open for construction, but have expressly provided that the mill-owner shall not be discharged from any liability in relation to the premises—meaning the premises flowed—until he has paid or tendered the damages which may be assessed under the act.  These damages the defendants have not paid or tendered, nor have they procured them to be assessed, and they are not therefore to be discharged from any liability in relation to said premises ; and if not, then they are not to be discharged in this common law action of tort, but must answer and defend it as best they can, assured that the act of 1868 can afford them no protection or justification in this suit until they have " paid or tendered to the person aggrieved or damaged the amount of such adverse judgment" as may be rendered against them under the provisions of said act.

If plaintiff prevails in this case he will be entitled to damages as at common law, and not the damages provided for in the act of 1868.  As agreed by the parties, an auditor may be appointed at the next trial term to assess the plaintiff's damages in case the parties do not agree.

*Case discharged.*

# CORRECTIONS.

Page 103, 2d line from bottom, after *it*, insert *is*.
Page 207, 3d line from bottom, after *at*, insert *a*.
Page 244, 3d line of the opinion, for *and*, read *&*.
Page 245, 11th line from top, for *effect* read *affect*.
Page 512, 3d line from top, for *explained*, read *unexplained*.
Page 512, 10th line from bottom, for *Patterson*, read *Patteson*.
Page 520, 21st line from top, for *appears*, read *appeared*.